AMERICAN AUTOMOBILE MANUFAC-
TURERS ASSOCIATION, et al.,
Plaintiffs, Appellees,

v.

MASSACHUSETTS DEPARTMENT OF
ENVIRONMENTAL PROTECTION,
Defendant, Appellant.

No. 98–1036.

United States Court of Appeals,
First Circuit.

Heard May 8, 1998.

Decided Dec. 29, 1998.

William L. Pardee, Assistant Attorney General, Environmental Protection Division, with whom Scott Harshbarger, Attorney General of Massachusetts and James R. Milkey, Assistant Attorney General, Environmental Protection Division, were on brief, for appellant.

Dennis C. Vacco, Attorney General of the State of New York, Peter H. Schiff, Deputy Solicitor General, Lisa M. Burianek, Assistant Attorney General, Section Chief and James M. Tierney, Assistant Attorney General, on brief for the State of New York, amicus curiae.

Edward W. Warren, with whom Stuart A.C. Drake, Gary E. Marchant, Jeffrey Bossert Clark, Kirkland & Ellis, Robert F. Sylvia, Eric F. Eisenberg, Hinckley, Allen & Snyder, Phillip D. Brady, V. Mark Slywynsky, Charles H. Lockwood and John T. Whatley were on brief, for appellees.

Before TORRUELLA, Chief Judge, CYR, Senior Circuit Judge, and STAHL, Circuit Judge.

TORRUELLA, Chief Judge.

Defendant-appellant Commissioner of the Massachusetts Department of Environmental Protection ("MDEP") appeals from the district court's entry of summary judgment in favor of plaintiffs-appellees American Automobile Manufacturers Association, Association of International Automobile Manufacturers, Inc., and Massachusetts State Automobile Dealers Association, Inc. (collectively, "the Automakers"). In this appeal, the second in this case,[1] we face the

1. The prior circuit and district court decisions in this case are: *American Auto. Mfrs. Ass'n v. Comm'r, Massachusetts Dep't of Envtl. Protection,* 998 F.Supp. 26 (D.Mass.1998) *("AAMA IV");* *American Auto. Mfrs. Ass'n v. Comm'r, Massachusetts Dep't of Envtl. Protection,* 998 F.Supp. 10 (D.Mass.1997) *("AAMA III");* *American Auto. Mfrs. Ass'n v. Commn'r, Massachusetts Dep't of Envtl. Protection,* 31 F.3d 18 (1st Cir.1994) *("AAMA II");* *American Auto. Mfrs. Ass'n v. Greenbaum,* No. 93–10799–MA, 1993 WL 443946 (D.Mass. Oct.27, 1993) *("AAMA I").*

question whether § 209(a) of the Clean Air Act ("CAA"), 42 U.S.C. § 7543, preempts Mass. Regs.Code tit. 310, § 7.40(12), which requires automakers to manufacture a certain number of zero-emission electric vehicles ("ZEVs") powered by "advanced" batteries for sale in Massachusetts prior to the 2003 model year.

## I. Background

The district court's decision does an admirable job of surveying the facts. *See American Auto. Mfrs. Ass'n v. Commissioner, Massachusetts Dep't of Envtl. Protection,* 998 F.Supp. 10, 12–16 (D.Mass.1997) ("*AAMA III* "). We therefore present only a summary of the relevant facts, and refer readers desiring greater detail to the district court's decision.[2]

### A. Statutory background

Section 209(a) of the CAA prohibits states from "adopt[ing] or attempt[ing] to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." 42 U.S.C. § 7543(a). The federal government thus has complete and exclusive authority to regulate motor vehicle emissions, and any state regulation of this area is expressly preempted.

However, as an exception to this broad preemption mandate, the CAA permits California, alone among the states, to formulate and adopt its own emissions control standards as long as these meet certain prerequisites. In particular, the CAA requires the U.S. Environmental Protection Agency to grant a waiver from preemption to California's vehicle emission standards if California determines that its standards will be no less protective of the public health than the federal standards. Still, California's discretion in making that determination is not unfettered, for the EPA is not required to grant the waiver if it finds that California's determination was arbitrary or capricious, or that conditions in California are not so compelling and extraordinary as to make the standards necessary. *See* 42 U.S.C. § 7543(b) (codifying Section 209(b) of the CAA).[3] This exception was limited to California partly because it is the largest single market for automobiles in the United States, and partly in recognition that California already had a regulatory framework for the control of emissions in place by the time that the CAA became law. *See Motor Vehicle Mfrs. Ass'n*

---

**2.** In addition to the prior decisions in this case, *see supra* note 1, it may also prove useful to survey the decisions handed down in a parallel suit involving New York State's adoption of California's LEV program. *See American Auto. Mfrs. Ass'n v. Cahill,* 152 F.3d 196 (2d Cir.1998) ("*MVMA VII* "); *American Auto. Mfrs. Ass'n v. Cahill,* 973 F.Supp. 288 (N.D.N.Y.1997) ("*MVMA VI* "); *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Cons.,* 79 F.3d 1298 (2d Cir.1996) ("*MVMA V* "); *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Cons.,* 869 F.Supp. 1012 (N.D.N.Y.1994) ("*MVMA IV* "); *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Cons.,* 17 F.3d 521 (2d Cir.1994) ("*MVMA III* "); *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Cons.,* 831 F.Supp. 57 (N.D.N.Y.1993) ("*MVMA II* "); *Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Conservation,* 810 F.Supp. 1331 (N.D.N.Y.1993) ("*MVMA I* "). Even though the plaintiff in *MVMA VI* and *MVMA II* is the AAMA and not the MVMA, they are labeled thus partly because the AAMA is the successor entity to the MVMA, and partly in order to avoid confusion with the decisions in the Massachusetts lawsuit.

**3.** Section 209(b) requires the Administrator of the U.S. Environmental Protection Agency to "waive the application of [sec. 209(a) ] to [California] if [California] determines that [its standards for the control of motor vehicle and engine emissions] will be, in the aggregate, at least as protective of the public health and welfare as applicable Federal standards," unless the Administrator finds that either California's determination is arbitrary and capricious, or that California's needs are not so compelling and extraordinary as to call for a waiver. 42 U.S.C. § 7543(b). Section 209(b) also provides that waiver is not permitted if "[California's] standards and accompanying enforcement procedures are not consistent with section 7521(a) of this title." *Id.* Among other things, standards are deemed to be inconsistent with § 7521(a) when " 'there is inadequate leadtime to permit the development of technology necessary to meet the proposed requirements, giving appropriate consideration to the cost of compliance within [the proposed] time frame.' " *Motor Vehicle Mfrs. v. New York State Dep't of Envtl. Cons.,* 17 F.3d 521, 526 (2d Cir.1994) (quoting from U.S. Environmental Protection Agency, *Waiver of Federal Preemption, California Low–Emission Vehicle Standards* at 57–58 (Jan. 7, 1992)).

*v. New York State Dep't of Envtl. Cons.*, 17 F.3d 521, 525 (2d Cir.1994) (*"MVMA III"*).

In 1977, a second, limited exception to section 209(a)'s preemption mandate was created when Congress enacted section 177 of the CAA, which allows other states to copy California standards for which a waiver has been provided under section 209(b). Section 177 reads as follows:

> Notwithstanding [§ 209(a)'s preemption provision], any State ... may adopt and enforce for any model year standards relating to control of emissions from new motor vehicles or ... engines and take such other actions as are referred to in [§ 209(a) ] of this title respecting such vehicles if—
>
> > (1) such standards are identical to the California standards for which a waiver has been granted for such model year, and
> >
> > (2) California and such State adopt such standards at least two years before commencement of such model year....

42 U.S.C. § 7507. In 1990, section 177 was amended by adding the following language:

> [n]othing in this section [section 177] ... shall be construed as authorizing any such State to ... take any action of any kind to create, or have the effect of creating, a motor vehicle or ... engine different than a motor vehicle or ... engine certified in California under California standards (a "third vehicle") or otherwise create such a "third vehicle."

42 U.S.C. § 7507. Thus, although it broadens the choices available to other states by permitting them to adopt California instead of federal standards, section 177 nevertheless preserves California's special status as the only state that is empowered to formulate and develop alternatives to the federal emissions-control standards for motor vehicles. Both the statutory language and the legislative history suggest that section 177 was the result of a compromise between the competing interests of the states and the automakers, giving states greater flexibility in dealing with the control of emissions without overburdening automakers with too many separate emissions-control standards. *See MVMA III*, 17 F.3d at 527.

## B. Factual background

In 1990, the California Air Resources Board ("CARB") adopted the Low Emission Vehicle ("LEV") program. CARB's LEV program classifies new vehicles into four different low emission categories: Transitional Low Emission Vehicles ("TLEV"), Low Emission Vehicles ("LEV"), Ultra Low Emission Vehicles ("ULEV"), and Zero Emission Vehicles ("ZEV"). The program forces the seven largest automakers to sell and lease low emission vehicles by requiring them to meet a Non-methane organic gases ("NMOG") Fleet Average standard. This standard allowed each automaker to sell or lease any combination of the four types of low emission vehicles, so long as the total emission of NMOGs by that automaker's fleet of vehicles meets the standard for NMOG emissions for that model year.[4]

Furthermore, each automaker may meet its NMOG standard by the use of credits, either earning them by surpassing the standard for a given year, or purchasing them from another manufacturer. However, before the LEV program was amended in 1996, the one restriction on the automaker's choice of vehicle mix was that ZEVs had to comprise two percent of all vehicles sold or leased by each manufacturer in California each year for model years 1998–2000, five percent for model years 2001–2002, and ten percent for model year 2003. The EPA granted California a waiver of preemption for its LEV plan on January 7, 1993, and both Massachusetts and New York copied the LEV program pursuant to section 177. *See* Mass. Regs.Code tit. 310, § 7.40(12); N.Y. Comp.Codes R. & Regs. tit. 6, § 218–3.1.

In March 1996, CARB amended the LEV program by eliminating the ZEV sales quotas for the 1998–2000 and 2000–2002 model years, leaving in place, however, the ten percent sales requirement for model year 2003. The Automakers state that CARB eliminated the ZEV requirement from the LEV program because technological and commercial considerations made it substantially difficult

---

4. The NMOG standard requires progressively lower average fleet emissions each year.

for automakers to comply with the requirement prior to the year 2001. MDEP vehemently disagrees with this version of events, for reasons explained below. In any case, CARB then submitted the amended LEV program, now without a pre–2003 ZEV requirement, to the EPA for confirmation that it remained within the 1992 waiver. To date, the EPA has not made a determination.

It would seem that the Automakers would not be required to sell any ZEVs in California before the 2003 model year. However, later in 1996, CARB entered into private Memoranda of Agreement ("MOAs") with each of the seven largest automakers, pursuant to which the automakers committed themselves to fund research on advanced battery technologies, and, more importantly, to supply a certain number of ZEVs to California urban markets for the 1998–2000 model years. The MOAs also provide that if the automakers were to fail to comply with their obligations, CARB could seek liquidated damages from the automakers, and could also reinstate the regulations that established the ZEV sales requirement.[5] CARB, in turn, committed itself "to facilitate purchases in state fleets, to work with the Department of Insurance and with banks to facilitate coverage and financing issues, to work on battery disposal and recycling, and to provide charging stations for the public and contractors." *AAMA III*, 998 F.Supp. at 14. No specific remedies were provided to the Automakers in case the state failed to comply with its side of the bargain.

Both CARB and the Automakers contended that the MOAs were legally-enforceable contracts under California law, as opposed to regulations. Consistently with that characterization, CARB declined to hold public hearings on the content of the MOAs, or to submit them to the California Office of Administrative Law (as all California regulations must be). In addition, CARB did not make formal findings—nor did it seek confirmation from the EPA—as to whether the MOAs fell within the scope of the 1992 waiver.

After CARB and the Automakers entered into the MOAs, Massachusetts amended the ZEV portion of its LEV program to duplicate certain portions of the MOAs. In particular,

> [MDEP] did not strictly duplicate the MOAs. Instead, [MDEP] amended the Massachusetts regulations to reflect only the ZEV requirements set forth in the MOAs between CARB and the auto manufacturers. 310 CMR 7.40, . The Massachusetts regulations, therefore, include ZEV requirements for the years 1998 through 2000 which are no longer required by the amended California LEV program, but, instead, are included in the voluntary MOAs between CARB and the Automakers. 310 CMR 7.40(12), . The portions of the MOAs which cite reciprocal obligations on behalf of CARB were not included in the Massachusetts amended regulations.

*AAMA III*, 998 F.Supp. at 15. The amended regulations also required the Automakers to provide certain information regarding their future plans to produce ZEVs.

## C. Procedural background

The Automakers originally filed suit against both Massachusetts and New York in 1993, after these states had copied California's original LEV program, arguing that these states had failed to comply with section 177.[6] The Automakers raised four claims in their suit against Massachusetts: that MDEP's LEV regulations were not identical

5. The district court noted that, pursuant to the MOAs,. "CARB explicitly retained the right to take regulatory action including reinstatement of the percentage ZEV requirements previously repealed," in case the Automakers violated the terms of the MOAs. *American Automobile Mfrs. Ass'n*, 998 F.Supp. at 14. By negative implication, this suggests that if the Automakers did not violate the terms of the MOAs, CARB would be contractually bound *not* to reinstate the ZEV regulations. We note that such a result would be of questionable validity, given the longstanding doctrine that a state legislature cannot alienate its police power. *See, e.g., Stone v. Mississippi*, 101 U.S. 814, 817, 25 L.Ed. 1079 (1879) ("[T]he legislature cannot bargain away the police power of a State, [although] [i]rrevocable grants of property and franchises may be made if they do not impair the supreme authority to make laws for the right government of the State."). Although CARB is a state regulatory agency rather than a state legislature, the same principle would seem to be applicable to its actions.

6. *See generally supra* notes 1, 2.

to California's because they did not adopt California's clean fuel regulations; that the regulations forced them to create a "third vehicle" because gasoline sold in Massachusetts had a higher sulfur content; that the regulations were adopted by MDEP before the EPA had granted California a waiver; and that "the two-year leadtime requirement precluded [MDEP] from applying the regulations to any 1995 models because two Automakers planned to begin producing 1995 cars before two years passed after the regulations were adopted." *American Auto. Mfrs. Ass'n v. Comm'r, Massachusetts Dep't of Envtl. Protection,* 31 F.3d 18, 22 (1st Cir.1994) (*"AAMA II"*).

The Automakers moved for a preliminary injunction against the enforcement of MDEP's LEV program, but their motion was denied. *See American Auto. Mfrs. Ass'n v. Greenbaum,* No. 93–10799–MA, 1993 WL 443946 (D.Mass. Oct.27, 1993) (*"AAMA I"*). On appeal, the AAMA waived its arguments for injunctive relief on any basis other than the leadtime issue. A prior panel of this court denied the relief sought, and remanded the case for trial on the sole remaining issue. *See AAMA II,* 31 F.3d at 28.

In the meantime, the Second Circuit had held in February 1994 "that New York's LEV program fell within the 'opt-in' provision of section 177." *See American Auto. Mfrs. Ass'n v. Cahill,* 152 F.3d 196 (2d Cir. 1998) (*"MVMA VII"*) (citing *MVMA III,* 17 F.3d at 532–33). On remand, the district court granted summary judgment in favor of the state defendants. *See Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Cons.,* 869 F.Supp. 1012 (N.D.N.Y. 1994) (*"MVMA IV"*). In January 1996, the Second Circuit affirmed the district court's ruling. *See Motor Vehicle Mfrs. Ass'n v. New York State Dep't of Envtl. Cons.,* 79 F.3d 1298 (2d Cir.1996) (*"MVMA V"*).

As noted earlier, California repealed its ZEV requirement two months after the Second Circuit's decision in *MVMA V* was issued, and entered into MOAs with the Automakers a few months after that. New York, unlike Massachusetts, chose not to amend its LEV program to incorporate the terms of the MOAs in regulatory form. The Automakers thus filed a new suit in February 1997, contending that New York could not enforce California's original ZEV requirement because it was no longer in force in California.[7]

In contrast to the original New York suit, the Massachusetts suit was still pending in the district court. Thus, instead of filing a new suit, the Automakers sought and were granted leave to file a third amended complaint, which they filed in December 1996. In the amended complaint, the Automakers put forward a claim that is a variation on the one raised in the New York suit, contending that MDEP's newly-amended ZEV requirement was preempted by section 209(a) because it was not identical to any California ZEV standard currently in effect, such standard having been repealed earlier that year. Implicit in this argument is the claim that the MOAs are not "California standards for which a waiver has been granted" for purposes of both sections 177 and 209. The parties then filed cross-motions for summary judgment. In a well-written and thoughtful opinion, the district court granted the plaintiffs' motion, and denied the defendant's, holding that MOAs are not standards, and therefore cannot be adopted by Massachusetts or any other state. *See AAMA III,* 998 F.Supp. at 24. MDEP now appeals.

## II. The primary jurisdiction doctrine

The Supreme Court "recognized early in the development of administrative agencies that coordination between traditional judicial machinery and these agencies was necessary

---

**7.** On cross-motions for summary judgment, the district court again ruled for the state defendants. *See American Auto. Mfrs. Ass'n v. Cahill,* 973 F.Supp. 288 (N.D.N.Y.1997) (*"MVMA VI"*). Three months ago, however, the Second Circuit reversed and entered judgment for the Automakers, holding that New York's ZEV requirement, although identical to California's ZEV require-ment contained in its original LEV program, no longer had a counterpart in California's current LEV regulations, and was therefore not protected from preemption under section 209(a) by section 177's opt-in provision. *See American Auto. Mfrs. Ass'n v. Cahill,* 152 F.3d 196 (2d Cir.1998) (*"MVMA VII"*).

if consistent and coherent policy were to emerge, ... [and][t]he doctrine of primary jurisdiction has become one of the key judicial switches through which this current has passed." *Port of Boston Marine Terminal Ass'n v. Rederiaktiebolaget Transatlantic,* 400 U.S. 62, 68, 91 S.Ct. 203, 27 L.Ed.2d 203 (1970) (citing *Texas & P Ry Co. v. Abilene Cotton Oil Co.,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553 (1907)). The Court's most recent restatement of the primary jurisdiction doctrine explained that it "is a doctrine specifically applicable to claims properly cognizable in court that contain some issue within the special competence of an administrative agency. It requires the court to enable a 'referral' to the agency, staying further proceedings so as to give the parties reasonable opportunity to seek an administrative ruling." *Reiter v. Cooper,* 507 U.S. 258, 268, 113 S.Ct. 1213, 122 L.Ed.2d 604 (1993) (citing *United States v. Western Pac. R.R. Co.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956)).

■ However, "[n]o fixed formula exists for applying the doctrine of primary jurisdiction. In every case, the question is whether the reasons for the existence of the doctrine are present and whether the purposes it serves will be aided by its application in the particular litigation." *Western Pacific,* 352 U.S. at 64, 77 S.Ct. 161. One reason for the doctrine is to avoid the possibility that a court's ruling might disturb or disrupt the regulatory regime of the agency in question. *See* 2 Kenneth C. Davis & Richard J. Pierce, Jr., *Administrative Law Treatise* § 14.1 at 272 (3d ed.1994). A similar consideration is that the goal of national uniformity in the interpretation and application of a federal regulatory regime is furthered by permitting the agency that has primary jurisdiction over the matter in question to have a first look at the problem. *See Western Pacific,* 352 U.S. at 64, 77 S.Ct. 161 (citing *Texas & Pacific v. Abilene Oil,* 204 U.S. 426, 27 S.Ct. 350, 51 L.Ed. 553).

■ Furthermore, the following factors help to "guide the decision whether or not to refer a matter to an agency under the primary jurisdiction doctrine," *Commonwealth of Massachusetts v. Blackstone Valley Elec.*

*Co.,* 67 F.3d 981, 992 (1st Cir.1995), especially when the matter involves questions of fact:

> (1) whether the agency determination l[ies] at the heart of the task assigned the agency by Congress; (2) whether agency expertise [i]s required to unravel intricate, technical facts; and (3) whether, though perhaps not determinative, the agency determination would materially aid the court.

*Id.* (quoting *Mashpee Tribe v. New Seabury Corp.,* 592 F.2d 575, 580 (1st Cir.1979)).

■ When the matter at issue is primarily one of statutory interpretation, referral of that matter to the agency with primary jurisdiction may also be generally advisable in precisely those circumstances in which a court would defer to the agency's interpretation pursuant to *Chevron U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). *See* 2 Davis & Pierce, *Administrative Law Treatise* § 14.3 at 285 ("One of the many effects of *Chevron* is to increase the number of cases in which courts should refer issues to agencies under the primary jurisdiction doctrine."); *cf. Northwest Airlines, Inc. v. County of Kent,* 510 U.S. 355, 366 n. 10, 367, 114 S.Ct. 855, 127 L.Ed.2d 183 (1994) (after noting that interpretation of statute within agency's purview might have been referred to the agency pursuant to the primary jurisdiction doctrine, the Court stated that it would have accorded substantial deference to the agency's interpretation); *New England Legal Found. v. Massachusetts Port Auth.,* 883 F.2d 157, 171–73 (1st Cir. 1989) (ruling on an issue by agency with primary jurisdiction over that issue was owed *Chevron* deference, and district court erred in not referring that issue to the agency).

■ These factors, however, must be balanced against the potential for delay inherent in the decision to refer an issue to an administrative agency. *See PHC, Inc. v. Pioneer Healthcare, Inc.,* 75 F.3d 75, 80–81 (1st Cir. 1996); *see generally* 2 Davis & Pierce, *Administrative Law Treatise* § 14.6. In cases where the potential for delay is found to be too great to justify a straightforward referral, the court may, in its discretion, either choose not to refer the matter to the agency,

or take such other action as it deems appropriate. For example, a court might refer a matter to an administrative agency, explicitly providing, however, that if the agency fails to rule within a reasonable amount of time, the court would either vacate the referral order and decide the matter itself,[8] or issue an order under 5 U.S.C. § 706(1), which authorizes courts to "compel agency action ... unreasonably delayed."[9]

Finally, the specific procedure utilized to enable the referral is flexible. If the agency's enabling statute contains "a mechanism whereby a court can on its own authority demand or request a determination from the agency," *Reiter*, 507 U.S. at 268 n. 3, 113 S.Ct. 1213, that mechanism should be used. However, where no such mechanism exists, the court takes no direct action; "that is left to the adversary system, the court merely staying its proceedings while the [party seeks a ruling from the agency]." *Id.* Furthermore, retaining jurisdiction while staying the proceedings is not the only means available for a court to comply with the primary jurisdiction doctrine. So long as the parties would not be unfairly prejudiced, the court has the discretion to dismiss the case without prejudice, instead. *See id.* at 268–69, 113 S.Ct. 1213.

## III. Analysis

The district court noted that the question whether the MOAs were within the scope of the 1992 waiver was one within the primary jurisdiction of the EPA, but concluded that the question need not be reached because the MOAs were not "standards" for purposes of section 177. For the reasons discussed below, we disagree with the latter conclusion, and thus find that the primary jurisdiction doctrine requires that we refer to the EPA several of the issues raised in this appeal,

including the question whether the MOAs are "standards."

### A. Does MDEP's ZEV mandate fall within the preemptive scope of § 209(a)?

Section 177 provides that a state may "adopt and enforce ... standards relating to control of emissions from new motor vehicles ... *and take such other action* as are referred to in section [209(a) ] if such standards are identical to California standards for which a waiver has been granted...." 42 U.S.C. § 7507 (emphasis added). Section 209(a), in turn, provides not only that "[n]o State ... shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles ...", but also that "[n]o State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle ... as a condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle...." 42 U.S.C. § 7543(a).

MDEP argues that section 177 distinguishes state standards from "other actions," such as enforcement mechanisms, and only requires identicality of standards, not of "other actions." MDEP further contends that its ZEV mandate is an enforcement mechanism, and thus not subject to section 177's identicality requirement. The Automakers, in turn, argue that the plain language of section 177 indicates that "such standards" refers to the adoption of or attempt to enforce emissions standards, and thus, that the identicality requirement applies to enforcement procedures too.

The district court found for the Automakers on this issue, but on somewhat different grounds. In particular, the court disagreed with the Automakers' contention that section

---

**8.** *See Wagner & Brown v. ANR Pipeline Co.,* 837 F.2d 199, 206 (5th Cir.1988) (ordering district court to refer matter to agency, but providing that if agency did not issue ruling within 180 days, district court should proceed to resolve the matter itself) (cited in 2 Davis & Pierce, *Administrative Law Treatise* § 14.6 at 304).

**9.** However, the availability of § 706(1) relief may be quite limited. Without deciding the matter,

we note that in *Telecomms. Research and Action Ctr. v. Federal Communications Comm'n,* 750 F.2d 70, 78 (D.C.Cir.1984), which has been followed by most other circuit courts of appeals, the court set forth a six-part test for determining whether agency action has been unreasonably delayed that is very deferential to administrative agencies.

177 always requires identicality of enforcement procedures. However, noting that "the proper question is not whether Massachusetts' regulation constitutes a standard [or an enforcement procedure], but whether by enacting the regulation, Massachusetts 'adopts or attempts to enforce' a standard," *AAMA III*, 998 F.Supp. at 17, the court found that even if the ZEV mandate could be termed an enforcement procedure, it was a procedure that attempted to enforce an emissions standard, which is plainly covered by the language of section 209(a). The court therefore rejected MDEP's argument that the mandate was outside of section 209(a)'s preemptive scope merely by dint of being an enforcement procedure. Furthermore, the court noted that "[i]t is not consistent with congressional intent that an 'enforcement procedure' could validly enforce a 'standard' that would be preempted," *id.* at 19, and consequently, held that the ZEV mandate in this case—whether it be labeled a standard or an enforcement procedure—would be preempted unless it adopted or enforced a standard identical to a federal or California standard.

■ We agree with the district court's determination that MDEP's ZEV mandate "adopts or attempts to enforce" an emissions standard, and is thus presumptively preempted by section 209(a). Moreover, although we, unlike the district court, are not convinced that section 177's identicality requirement is inapplicable to enforcement procedures in general, we do find that such an interpretation of the CAA's provisions would be reasonable. The statutory language does distinguish at times between standards and enforcement procedures, which lends support to the claim that when section 177 refers to standards alone, the omission of a reference to enforcement procedures is intentional and meaningful. For example, section 209(b)(1)(C) provides that the EPA should not grant California a waiver if the EPA finds that " ... such State standards *and*

*accompanying enforcement procedures* are not consistent with section 7521(a) ... ." 42 U.S.C. § 7543(b)(1)(C) (emphasis added). This construction stands in contrast to section 177, which provides that states may adopt and enforce standards when its standards (the statute makes no mention here of enforcement procedures) are identical to California standards.[10]

Thus, the fact that section 209(a) presumptively preempts both standards and enforcement procedures does not compel the conclusion that section 177's identicality requirement is coextensive with section 209(a)'s scope. To the contrary, section 177 could be read to protect from preemption both standards and enforcement procedures only when the standards (independently of the enforcement procedures) are identical to California standards.

We are not deciding the matter one way or another. We merely point out that sections 177 and 209(a) lend themselves to competing interpretations—MDEP's, which was accepted by the district court, and the Automakers'—and that both are sufficiently reasonable that we would be bound by *Chevron* to defer to the EPA's choice of either one. This matter is plainly within the EPA's primary jurisdiction, and its resolution could clearly benefit from a deep familiarity with the CAA and the public policy considerations that underlie these statutory provisions. We therefore refer this issue to the EPA for its consideration.

The EPA's answer will dispose of at least one issue in this case. There is no question that MDEP's reporting requirements, *see* Mass.Code Regs. tit. 310, § 7.40(12)(g) (requiring manufacturers to submit annual ZEV product plans regarding future products), are enforcement procedures, as opposed to "standards," for purposes of section 177. Thus, if the EPA determines that enforcement proce-

10. There is other evidence in the text of the CAA that Congress is perfectly capable of specifying when it intends to require identicality of enforcement procedures. For example, § 209(e)(2), which deals with emissions standards for certain nonroad vehicles and engines, permits California to adopt its own emissions standards, subject to the EPA's approval, just like section 209(a) does

for road vehicles. More importantly, section 209(e)(2)(B), like section 177, permits other states to adopt and enforce California standards adopted under section 209(e)(2), but, unlike section 177, only "if such standards *and implementation and enforcement* are identical" to California's. 42 U.S.C. 7543(e)(2)(B) (emphasis added).

dures are not subject to section 177's identicality requirement, then MDEP's reporting requirements will not be preempted—that is, so long as the rest of MDEP's ZEV regulations are identical to a California standard, which we further discuss below. In contrast, if the EPA determines that in order for other states to benefit from section 177's opt-in provisions, they must adopt not only California's emissions standards, but also its enforcement procedures, then it is likely that we would find that the reporting requirements are preempted unless they are identical to California reporting requirements.[11]

■ The EPA's answer to whether MDEP's ZEV sales mandate is subject to section 177's identicality requirement, however, is more complicated. It depends, in part, on whether the relevant "standard" is the NMOG fleet average standard, the ZEV certification standard, or the ZEV sales mandate. For example, it could be argued that the NMOG is the relevant standard for purposes of section 177 because it is the only one directly concerned with the total emissions of pollutants into the atmosphere. Indeed, because the Automakers are ultimately required only to maintain the fleet average emission level mandated by the LEV program, it does not matter how many vehicles from each emission-level category they sell.

In that sense, the ZEV mandate portion of the LEV program could be described as a mere enforcement procedure, designed to ensure that the Automakers meet the NMOG standard, and, perhaps more importantly, that they will have sufficient manufacturing capacity to produce the numbers of ZEVs that will eventually be required to meet the ever-more stringent emissions requirements, particularly the ten percent quota for the

2003 model year that is still in force in California.[12]

Alternatively, the MDEP's ZEV mandate could be described as a means of enforcing the ZEV certification standard, by requiring the Automakers to sell a certain number of vehicles during the 1998–2000 model years that are certified to meet the ZEV emission limit. Either way, however, the ZEV mandate would not be preempted by section 209(a) because both "standards"—the NMOG and ZEV certification standards—are identical to California's NMOG and ZEV certification standards, which are still in force as part of its LEV program, and for which a waiver has been granted for model years 1998–2000.

Finally, one could view MDEP's ZEV mandate as a standard for the control of emissions, and not a mere enforcement procedure, because ZEV sales requirements are "in the nature of a command having a direct effect on the level of emissions, rather than in the nature of a means of enforcing, or testing the effectiveness of a command." *MVMA VII*, 152 F.3d at 200; *see also AAMA III*, 998 F.Supp. at 19. If that were the case, the ZEV mandate would have to be identical to a California standard if it were to avoid preemption, which would raise a host of subsidiary questions.

The question of whether the ZEV mandate is a standard is within the EPA's primary jurisdiction, and the statutory language permits more than one answer. We thus refer the question to the EPA for its consideration.

**B. Is MDEP's ZEV mandate identical to a California standard for which a waiver has been granted for the model years in question?**

If MDEP's ZEV mandate is a standard, and there is no California ZEV standard,

11. MDEP argues, in the alternative, that the reporting requirement is intended to enforce, not the interim period ZEV mandate, but instead the ten percent ZEV sales mandate for model year 2003, which all parties admit is still in effect in both California and Massachusetts. Because the EPA's answer may render this argument moot, we do not reach it at this time.

12. Although the LEV program gives Automakers almost complete flexibility to select the exact mix of vehicle types that they will produce so as to

meet the NMOG fleet average standard for each vehicle year, basic arithmetic suggests that, once the NMOG standard has decreased beyond a certain point, the only way for the Automakers to meet the standard will be to produce at least some ZEVs. The defendant's position is that it is only prudent, under such circumstances, to ensure that the Automakers' capacity to manufacture ZEVs in sufficient quantities has been developed before that point.

section 177 cannot protect the mandate from preemption. Furthermore, there are no longer any California regulations that establish a ZEV sales mandate for those years in effect. There are therefore only two alternatives that would permit other states to adopt non-federal ZEV standards for the model years prior to 2003. One is that the original California ZEV mandate that was contained in the LEV program for which a waiver was granted in 1992 could nevertheless still be copied by other states. The other is that the MOAs' ZEV mandate is a California "standard" for purposes of section 177, and that this mandate is within the scope of the 1992 waiver.

■ The first alternative, espoused by New York, was rejected by the Second Circuit in *MVMA VII*, 152 F.3d at 201. It is the second alternative that concerns us here, for, unlike New York, MDEP substantially amended its ZEV mandate in 1996, and can no longer argue that its amended ZEV mandate is identical to the original California ZEV mandate covered by the 1992 waiver. Thus, section 177 will not shield MDEP's ZEV mandate from preemption unless the MOAs are somehow "California standard[s] for which a waiver has been granted for the model year[s] in question." This, in turn, requires answers to three questions: (1) Are the MOAs within the preemptive scope of section 209(a)?; (2) If they are, are they also within the scope of the 1992 waiver?; and (3) If the MOAs are covered by the 1992 waiver, is Massachusetts' ZEV mandate identical to the MOAs?

The Automakers' basic argument is that the section 177 opt-in provision permits other states to copy only those California regulations which are still on the books, and therefore, that since the MOAs are not official California regulations, other states cannot rely on section 177 to incorporate their provisions into regulations of their own. MDEP responds, however, by arguing that in determining whether or not the MOAs are California standards for purposes of section 177, one should look to their function rather than their form. In support of this argument, MDEP asserts that the MOAs are merely regulations in contractual guise, whose form was chosen explicitly for the purpose of preventing other states from copying California's ZEV mandate.[13] It is not clear that even if true, this assertion is relevant for purposes of statutory interpretation, but it might be relevant when considering whether or not the MOAs interfere with the comprehensive regulation of vehicle emissions established by the CAA.

Relying on the CAA's plain language, the district court found for the Automakers on this issue. Framing the question as whether the MOAs were within section 209(a)'s preemptive scope, the court concluded that "[t]he plain meaning of [sections 209(a) and section 209(b)(1) ] indicates that Congress intended § 209 to apply to state regulations 'adopted' into state regulatory codes, rather than to agreements such as the MOAs, which were jointly executed instead of unilaterally 'adopted.'" *AAMA III*, 998 F.Supp. at 22. The court also found that there was no evidence that Congress intended the term "standards" to include voluntary contracts such as MOAs. *See id.* at 23.

■ We find that the district court should have referred these questions to the EPA. First, there is a vital need for a uni-

13. These do not seem to us to be groundless assertions. The timing of CARB's repeal of its original ZEV mandate and adoption of the MOAs certainly permits the inference that these actions were influenced by the prospect that the Automakers would lose their lawsuits in New York and Massachusetts. Indeed, CARB's general counsel has admitted as much in depositions. According to MDEP, the Automakers made CARB an offer it could not refuse. In exchange for the MOAs, CARB tendered its bargaining chip: its alleged ability to prevent other states from adopting ZEV mandates of their own. Both California and the Automakers profited from this deal, because the MOAs required the Automakers to do much more in California than the original ZEV mandate had, but the Automakers were spared the expense and trouble of having to design and sell ZEVs on a national scale. These gains, however, came at the expense of the remaining 49 states, which arguably lost their ability to adopt ZEV mandates identical to the one that California repealed. In this regard, the Automakers' claim that nothing prevents other states from negotiating MOAs is more than a trifle disingenuous, because the other states lack the leverage that section 177 gave California.

form answer to whether the MOA approach to the control of emissions is subject to section 209(a) preemption, and, thus, whether other states can piggyback onto the MOAs. Unfortunately, this court cannot provide a uniform answer applicable nationally; indeed, our answer would not even bind the EPA in this case. For example, even if this court rules that MOAs are not standards, and thus, by implication, that they are not subject to preemption, the EPA could still rule that 209(a) applies to MOAs and therefore that CARB must submit the MOAs for review to determine whether they fall within the scope of the previously-granted waiver. Only the EPA (and the Supreme Court) can provide a nationwide answer to this question.[14]

■ Second, the question of what constitutes a standard for purposes of section 209(a) preemption lies at the heart of the EPA's mandate to regulate vehicle emissions across the nation. Congress has entrusted the EPA with the responsibility of ensuring that California's regulations provide at least as much protection as the NAAQS and are otherwise in compliance with the CAA. Furthermore, EPA review of the California standards is the only way to ensure that the regulatory systems of the "opt-in" states are in compliance with the CAA, given that these states can copy California standards, and that there is no provision for separate review under section 177. In addition, MOAs present a threat to the EPA's authority because the MOA approach enables California to use its waiver power under section 209(b) to reg-ulate the Automakers in a manner beyond the reach of the EPA.[15]

Third, the EPA's interpretation of the CAA would, as a practical matter, be of great assistance. As described above, a good case can be made for the argument that the MOAs represent a conscious attempt to circumvent the "opt-in" provisions of section 177. *See supra* note 13. Of course, it may be that Congress intended to exclude MOAs from the preemptive scope of the CAA, even if doing so could undermine its carefully-designed structure for administering emissions controls. The proper resolution of this issue will require consideration not only of the statutory language itself, but also of congressional intent and of public policy. It would therefore be preferable to have the EPA, the agency entrusted with interpreting and enforcing the federal government's environmental policy, reach its own conclusions. Afterwards, if necessary, we would review the EPA's interpretation with deference to its greater institutional expertise and familiarity with the CAA.

## IV. Conclusion

For the reasons described above, we refrain from deciding this appeal at this time, and instead **stay** further proceedings to afford MDEP a reasonable opportunity to obtain a ruling from the EPA on the issues discussed above. However, if no agency ruling is forthcoming within 180 days from the date this opinion issues, the parties shall so

14. A federal agency, acting within the scope of the authority delegated to it by its enabling act, can preempt state and local action. *See City of New York v. Federal Communications Comm'n*, 486 U.S. 57, 64, 108 S.Ct. 1637, 100 L.Ed.2d 48 (1988). In the case before us, for example, the EPA can determine the scope of the preemptive effect of section 209(a) and we would accord substantial deference to that determination.

15. The Automakers vigorously contend that the fact that the MOAs are contracts rather than official regulations necessarily means that they are outside the scope of section 209(a). Though the argument is plausible, we are not entirely convinced that it is correct. As pointed out by MDEP, state contractual obligations may at times be preempted by federal law and regulations because, "government occupies a unique position of power in our society, and its conduct, regardless of form, is subject to special constraints." *Wisconsin Dep't of Indus., Labor, and Human Relations v. Gould*, 475 U.S. 282, 290, 106 S.Ct. 1057, 89 L.Ed.2d 223 (1986). In that case, for example, the Supreme Court held that Wisconsin "simply [was] not functioning as a private purchaser of services ... [because] for all practical purposes, Wisconsin's [law debarring state contracts with repeat violators of the NLRA] was tantamount to regulation." *Id.* at 289, 106 S.Ct. 1057. The question here is thus not whether section 209(a) of the CAA can preempt state contractual agreements that have the effect of regulating emissions, but rather, whether section 209(a) was intended to do so. As explained above, however, that is a question within the EPA's primary jurisdiction.

notify this court. We will then decide the issues before us without the EPA's guidance.