[709 NYS2d 1]

In the Matter of Subpoenas Duces Tecum Issued by the OFFICE OF THE ATTORNEY GENERAL OF THE STATE OF NEW YORK.

DETROIT DIESEL CORPORATION, Respondent, v ATTORNEY GENERAL OF THE STATE OF NEW YORK, Appellant.

MACK TRUCKS, INC., Respondent, v ATTORNEY GENERAL OF THE STATE OF NEW YORK, Appellant.

CUMMINS ENGINE CO., INC., Respondent, v ATTORNEY GENERAL OF THE STATE OF NEW YORK, Appellant.

CATERPILLAR, INC., Respondent v ATTORNEY GENERAL OF THE STATE OF NEW YORK, Appellant.

VOLVO TRUCK NORTH AMERICA, INC., et al., Respondents, v ATTORNEY GENERAL OF THE STATE OF NEW YORK, Appellant.

First Department, May 2, 2000

APPEARANCES OF COUNSEL

*Peter T. Barbur* of counsel (*Andrew G. Gordon, James A. Rubino, Jonathan S. Martel, Anthony Boccanfuso, Robert G. Abrams, Richard Ayres, Gilbert S. Keteltas, Gregory J. Commins, Jr., James B. Buda, David B. Tulchin, Michael E. Yaggy* and *Peter M. Corrigan* on the brief; *Cravath Swaine & Moore; Arnold & Porter; Howrey & Simon; Sullivan & Cromwell,* and *Piper & Marbury, L. L. P.,* attorneys), for respondents.

*J. Jared Snyder* of counsel (*Peter H. Schiff* on the brief; *Eliot Spitzer, Attorney General* of the State of New York), attorney, appellant *pro se.*

**OPINION OF THE COURT**

NARDELLI, J. P.

In this appeal, we are called upon to determine whether the

express preemption provision of the Clean Air Act precludes the Attorney General of the State of New York from pursuing claims arising out of the respondents' manufacture of heavy-duty diesel engines which, purportedly, were equipped with electronic devices specifically designed to circumvent Federal emissions controls and, concomitantly, whether certain subpoenas duces tecum issued by the Attorney General in furtherance of those claims should be quashed.

## The Federal Investigation

In the fall of 1997, the United States Environmental Protection Agency (EPA) commenced what it described in an October 22, 1998 press release as an "extensive investigation" into the heavy-duty diesel engine (HDDE) industry. The focus of the investigation was on the use by all HDDE manufacturers, including the petitioners herein, of electronic engine control systems, or "defeat devices," which allegedly differentiated between nitrogen oxide (NOx) emissions during "transient," or normal urban driving conditions, and NOx emissions during "steady state" or highway driving conditions, the former of which had been the exclusive regulatory focus of the EPA. The EPA maintained that the devices allowed the manufacturers to circumvent Federal emissions standards and violated various provisions of the Clean Air Act by vastly increasing the amount of NOx emitted by the HDDEs when engaged in driving patterns not reflected in the Federal emissions tests.

The parties entered into lengthy settlement negotiations and on October 22, 1998, the EPA, the United States Department of Justice and the individual manufacturers entered into consent decrees which were designed to: resolve all of the EPA's claims; reduce the emissions from HDDEs; ensure compliance with the Clean Air Act by having the manufacturers "replace the strategies the United States alleges are defeat devices and providing for emissions and compliance monitoring through the term of the Decree through supplementary test requirements;" and to accomplish the foregoing without "prolonged and complicated litigation."[1] On or about July 1, 1999, after the period for public comment expired, the United States District Court for the District of Columbia entered the decrees, having found them to be in the public interest.

---

1. The consent decrees also provided for civil penalties and other costs, in the aggregate, of over $1,000,000,000.

### The Subpoenas Duces Tecum

On the same date that the complaint and consent decrees were filed in the United States District Court, the Attorney General of the State of New York (Attorney General) issued identical subpoenas to petitioners Detroit Diesel Corporation, Mack Trucks, Inc., Cummins Engine Co., Inc., and Caterpillar, Inc., and allegedly served petitioner Volvo Truck North America, Inc., pursuant to Business Corporation Law § 307, approximately one week later.[2] The subpoenas state that they relate to an "investigation" of "repeated fraudulent or illegal acts or persistent fraud" allegedly perpetrated by HDDE manufacturers.

The subpoenas seek, *inter alia*: all testing data generated by each manufacturer in connection with its compliance with Federal emissions standards; all documents provided to the EPA with respect to that agency's recently concluded investigation of electronic engine controls for HDDEs; all correspondence between petitioners and either the EPA or the Department of Justice relating to the Federal investigation and the negotiations which led to the execution of the consent decrees; and all submissions by petitioners in response to the EPA's order to show cause concerning their compliance with the Federal emissions standards.

On November 18, 1998, a meeting was held between representatives of the HDDE manufacturers and an Assistant Attorney General of the State of New York (AAG) assigned to the Environmental Protection Bureau, in order to discuss the subpoenas. At that time, the AAG purportedly stated that the subpoenas were primarily intended to give the Attorney General "discovery" for possible use in opposing entry of the consent decrees. The AAG made it clear that any documents obtained through the use of the subpoenas would be utilized to support either New York's public comments regarding the consent decrees, which would be submitted to the Federal District Court, or a motion to intervene in the proceedings in that court.

Petitioners thereafter moved, by separate orders to show cause served on November 24, 1998, to quash the subpoenas. In opposition, the Attorney General maintained that the

---

2. The petitioners maintain that the court does not have in personam jurisdiction over Volvo Truck North America or Detroit Diesel Corporation as the Attorney General failed to satisfy the requirements set forth in CPLR 301 and 302.

preemptive effect of the Clean Air Act is not so broad that it forecloses the regulation of HDDEs after they have been sold and placed in use. The Attorney General also argued that the issue of preemption was premature and that State common-law actions for damages, such as fraud, breach of warranty, public nuisance and conspiracy to restrain trade, are not preempted by the Clean Air Act. The IAS Court disagreed, granted the petitions and quashed the subpoenas, holding, *inter alia*, that the petitions were not premature and that any investigation commenced by the Attorney General regarding alleged violations of Federal emissions standards is preempted by section 209 (a) of the Clean Air Act (42 USC § 7543 [a]). The Attorney General appeals and we now affirm.

### The Clean Air Act

The Clean Air Act (42 USC § 7401 *et seq.* [CAA]) has been described as "one of the most comprehensive pieces of legislation in our nation's history" (*Motor Vehicle Mfrs. Assn. v New York State Dept. of Envtl. Conservation*, 17 F3d 521, 524) which, when enacted by the United States Congress in 1955, was aimed primarily at increasing Federal research and assistance in reducing air pollution levels. The original version of the CAA made no attempt to establish Federal motor vehicle emission standards (*see*, Air Pollution Control—Research and Technical Assistance Act of 1955, Pub L 84-159, 69 US Stat 322).

Congress first enacted emissions standards for new motor vehicle engines in 1965 (*see*, Motor Vehicle Air Pollution Control Act of 1965, Pub L 89-272, § 202 [a], 79 US Stat 992) and, in 1967, imposed Federal preemption over motor vehicle emission standards, although California was granted a waiver from preemption because it is the largest single market for automobiles in the United States and because California had already developed and implemented a regulatory framework for the control of emissions by the time the CAA was enacted. Subsequent legislation permits other States to adopt California's standards if those States' standards "are identical to the California standards for which a waiver has been granted for such model year." (Pub L 95-95, § 129 [b], 91 US Stat 685, 750.)[3]

In its present form, title I of the CAA directs the EPA to develop national ambient air quality standards (NAAQS) for

---

3. Section 209 (b) of the CAA provides that California may only adopt and enforce its own emission standards after applying to and obtaining the approval of the EPA for a waiver of preemption.

pollutants which are determined to "cause or contribute to air pollution which may reasonably be anticipated to endanger public health or welfare" (42 USC § 7408 [a] [1] [A]). Title II of the CAA establishes a comprehensive framework for the EPA's regulation of emissions for new motor vehicles and motor vehicle engines, including the HDDEs which are at issue herein. Specifically, the CAA gives the EPA the responsibility of promulgating and enforcing emissions standards for NOx, particulate matter, carbon monoxide and hydrocarbons (*see*, 42 USC §§ 7521, 7543).

## Preemption

The Supremacy Clause of the United States Constitution provides that Federal laws "shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding" (US Const art VI [2]), and Congress is thereby vested with the power to supersede not only State statutory or regulatory law, but common law as well (*see*, *Freightliner Corp. v Myrick*, 514 US 280, 286-287; *Guice v Charles Schwab & Co.*, 89 NY2d 31, 39, *cert denied* 520 US 1118). The United States Supreme Court has recognized that the "[c]onsideration of issues arising under the Supremacy Clause 'start[s] with the assumption that the historic police powers of the States [are] not to be superseded by * * * Federal Act unless that [is] the clear and manifest purpose of Congress' " (*Cipollone v Liggett Group*, 505 US 504, 516, quoting *Rice v Sante Fe El. Corp.*, 331 US 218, 230; *see also*, *Drattel v Toyota Motor Corp.*, 92 NY2d 35, 42) and that " '[t]he purpose of Congress is the ultimate touchstone' " of every preemptive analysis (*Medtronic, Inc. v Lohr*, 518 US 470, 485, quoting *Retail Clerks Intl. Assn. v Schermerhorn*, 375 US 96, 103). The Court of Appeals of this State has also emphasized the "guiding principle that a 'preemption question is ultimately one of congressional intent' " (*Drattel v Toyota Motor Corp.*, *supra*, at 42, quoting *Guice v Charles Schwab & Co.*, *supra*, at 39).

Congressional preemptive intent can manifest itself in three forms: (1) expressly, in the language of the Federal statute; (2) implicitly, in those situations where the Federal legislation is so comprehensive in its scope that it is inferable that Congress intended to occupy the "field" of its subject matter and no room for additional State regulation exists; and (3) implicitly, in those instances where Federal law and State law actually conflict (*Drattel v Toyota Motor Corp.*, *supra*, at 42; *Guice v*

*Charles Schwab & Co., supra,* at 39; *Barnett Bank v Nelson,* 517 US 25).

In addition, the existence of an express preemption clause does not entirely foreclose the possibility of the existence of an implied preemption, as an express and implied preemption may exist in the same statute (*Freightliner Corp. v Myrick, supra,* at 289). Questions of preemption are to be determined on a case-by-case basis in order to ascertain "whether the dangers and hardships of diverse regulation justify foreclosing a State from the exercise of its traditional powers" (*Colorado Anti-Discrimination Commn. v Continental Air Lines,* 372 US 714, 719; *see also, Hall v DeCuir,* 95 US 485).

In *Motor Vehicle Mfrs. Assn. v New York State Dept. of Envtl. Conservation* (17 F3d 521, 526, *supra*), the United States Court of Appeals, Second Circuit, opined that the "cornerstone of Title II is Congress' continued express preemption of state regulation of automobile emissions." Section 209 (a) of the CAA (42 USC § 7543 [a]) provides: *"No State or any political subdivision thereof shall adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines* subject to this part. No State shall require certification, inspection, or any other approval relating to the control of emissions from any new motor vehicle or new motor vehicle engine as condition precedent to the initial retail sale, titling (if any), or registration of such motor vehicle, motor vehicle engine, or equipment." (Emphasis added.)

In enacting the legislation, Congress declared that: "State laws applicable to the control of emissions from new motor vehicles or new motor vehicle engines are superseded. The committee feels that a provision such as this is necessary in order to prevent a chaotic situation from developing in interstate commerce in new motor vehicles * * * The ability of those engaged in the manufacture of automobiles to obtain clear and consistent answers concerning emission controls and standards is of considerable importance" (HR Rep No. 728, 90th Cong, 1st Sess, reprinted in 1967 US Code Cong & Admin News 1938, 1956-1957).

Congress also voiced its concern that "vehicle manufacturers not be subject to 50 different sets of requirements relating to emission controls which would unduly burden interstate commerce" (HR Rep No. 294, 95th Cong, 1st Sess, reprinted in 1977 US Code Cong & Admin News 1077, 1388).

Thus, it is clear from the underlying history of the CAA that Congress intended the preemption provision to have a broad

scope so as to circumvent a situation where automobile and engine manufacturers would have to comply with different and, more likely than not, inconsistent State regulatory schemes. The Federal courts have recognized and restated Congress' clear intent in a number of cases. (*See, e.g., Engine Mfrs. Assn. v United States Envtl. Protection Agency*, 88 F3d 1075, 1079 ["(t)wo years after authorizing federal emissions regulations * * * Congress preempted the states from adopting their own emissions standards"]; *Motor Vehicle Mfrs. Assn. v New York State Dept. of Envtl. Conservation, supra*, at 526 ["(t)he cornerstone of Title II is Congress' continued express preemption of state regulation of automobile emissions"]; *American Auto. Mfrs. Assn. v Massachusetts Dept. of Envtl. Protection*, 163 F3d 74, 77 ["(t)he federal government thus has complete and exclusive authority to regulate motor vehicle emissions, and any state regulation of this area is expressly preempted"]; *Sims v State of Fla., Dept. of Highway Safety & Motor Vehicles*, 862 F2d 1449, 1460, *cert denied* 493 US 815 ["Congress has exclusively reserved to the federal government the enforcement of federal emission standards"]; *Direct Auto. Imports Assn. v Townsley*, 804 F2d 1408, 1411 ["(t)he language of (the CAA) is unambiguous: states may not require certification, inspection, or any *other approval* relating to emission control as a condition precedent to the titling of a new motor vehicle * * * the language of the statute draws no distinction between federal and state standards" (emphasis in original)].)

The Attorney General, however, urges a narrow interpretation of section 209 (a) and maintains that it solely preempts State enforcement of numerical standards, which the Attorney General suggests is defined as "a limit on the quantity of emissions set up by a State agency or legislature" and, as a result, States "remain free to enforce any statutory and common law requirements other than emission standards." In *Cable Tel. Assn. v Finneran* (954 F2d 91), however, the United States Court of Appeals, Second Circuit, held that "[w]here Congress has intended to pre-empt all state laws affecting a particular subject, it has employed language well suited to the task" (*supra*, at 101). The court went on to hold that statutes which expressly preempt State regulations which "relate to" a given subject matter or field are indicative of an expansive preemptive intent (*supra*, at 101; *see also, Morales v Trans World Airlines*, 504 US 374, 383-387; *Morrison v Viacom, Inc.*, 52 Cal App 4th 1514, 1526, 61 Cal Rptr 2d 544, 552). Here, the CAA specifically preempts the State from adopting or attempting to

enforce any standard *"relating to* the control of emissions from new motor vehicles or new motor vehicle engines" (CAA § 209 [a]; emphasis added). In light of the foregoing and Congress' unequivocal remarks on the purpose of the legislation, coupled with the broad language of the CAA, it is evident that CAA § 209 (a) was intended to have a broad preemptive effect.

## The Attorney General's Claims

The Attorney General currently argues on appeal that his investigation is, in reality, focused on "in-use" emissions produced by the HDDEs, rather than the production, manufacture and design of new engines. This argument is, while well intentioned, futile as the categories of information sought by the subpoenas refer to new HDDEs, their manufacture and distribution, Federal emissions requirements and Federal law. Indeed, in a submission to the IAS Court, the Attorney General represented, *inter alia*, that: "[T]he subpoenas duces tecum at issue [are] in support of [the] investigation of the diesel manufacturers' practice of *producing diesel engines* which produce emissions of nitrogen oxides (NOx) at levels two to three times above the permitted levels. For a period of up to ten years, the manufacturers have engaged in this activity *at the same time they were certifying to the federal government that the engines complied with the applicable emission control requirements* * * * At issue in this investigation is the manufacturers' apparent practice of equipping their engines with computer mechanisms *which circumvent federal emissions controls for the emissions of nitrogen oxides ('NOx').*" (Emphasis added.)

In any event, the Attorney General now opines that the preemption provision of the CAA is limited to new engines and does not preclude State regulation of engines installed in motor vehicles after they have been sold. However, while it is true that the CAA permits States to adopt in-use regulations which are expressly designed to control emissions (*Engine Mfrs. Assn. v United States Envtl. Protection Agency*, 88 F3d 1075, 1094, *supra* [referring to regulations such as carpool lanes, restrictions on car use in downtown areas, and programs to control the extended idling of vehicles]), a State may not impose its own emission control standards the moment a new vehicle is registered, as the purpose of the CAA would be circumvented (*Engine Mfrs. Assn. v United States Envtl. Protection Agency*, *supra*, at 1086; *Allway Taxi v City of New York*, 340 F Supp 1120, 1124, *affd* 468 F2d 624). In this matter, it is clear that the Attorney General's claims concerning "in-use emissions"

target the manufacturers' practice of producing diesel engines purportedly designed to skirt Federal emissions standards by producing excess NOx levels. As such, these claims are preempted.

Likewise, the Attorney General is mistaken in his contention that as long as he is using his powers to provide the manufacturer with additional incentive to comply with Federal standards, his actions are not preempted. In light of the CAA's broad preemption provision, States are barred from providing their own regulatory or judicial remedies for conduct prohibited or arguably prohibited by Federal law. Indeed, in *Sims v State of Fla., Dept. of Highway Safety & Motor Vehicles* (862 F2d 1449, *cert denied* 493 US 815, *supra*), a Florida State agency raised the identical argument, which prompted the United States Court of Appeals, Eleventh Circuit, to observe that "[a]lthough the state may base its contention on proper and wholesome intentions, nevertheless, Congress specifically stated that '[n]o state * * * shall adopt *or attempt to enforce* any [federal or state] standard relating to the control of emissions from new motor vehicles'" (*supra*, at 1455).

## Common-Law Claims

In *Guice v Charles Schwab & Co.* (89 NY2d 31, *supra*), the Court of Appeals held that State common-law claims may be preempted if such claims would unavoidably result in serious interference with the "'accomplishment and execution of the full purposes and objectives of Congress'" (*supra*, at 45, quoting *Hines v Davidowitz*, 312 US 52, 67). In *Cipollone v Liggett Group* (505 US 504, 521, *supra*), the United States Supreme Court passed upon the preemptive effect of the Public Health Cigarette Smoking Act of 1969 (Pub L 91-222, 84 US Stat 87, as amended [15 USC §§ 1331-1340]), which provided that: "'[n]o *requirement or prohibition* based on smoking and health shall be imposed under *State law* with respect to the advertising or promotion of any cigarettes the packages of which are labeled in conformity with the provisions of this Act'" (*supra*, at 515 [emphasis added], quoting 15 USC § 1334).

The argument raised against preemption of common-law actions before the Supreme Court was premised upon the view that common-law actions do not impose requirements or prohibitions and that Congress intended only to trump State statutes, injunctions or executive pronouncements. Likewise, in the matter presently before us, the Attorney General advances the argument that Congress, in enacting the CAA,

simply sought to preempt the State enforcement of numerical emission standards and, therefore, the States remain free to enforce statutory and/or common-law requirements other than emission standards. The plurality in *Cipollone*, however, rejected distinctions between positive enactments by State statutes or regulations and the onus of State common-law tort liability for preemption purposes, finding that such actions can, and often do, have the same effect. The Supreme Court held that: "As we noted in another context, '[state] regulation can be as effectively exerted through an award of damages as through some form of preventive relief. *The obligation to pay compensation can be, indeed is designed to be,* a potent method of governing conduct and controlling policy.' " (*Cipollone v Liggett Group, supra*, at 521 [emphasis added], quoting *San Diego Bldg. Trades Council v Garmon*, 359 US 236, 247; *see also,* *Lynnbrook Farms v SmithKline Beecham Corp.*, 79 F3d 620, *cert denied* 519 US 867.)

In this case, the State is forbidden to "adopt or attempt to enforce any standard relating to the control of emissions from new motor vehicles or new motor vehicle engines." (42 USC § 7543 [a].) In pursuing the common-law claims, the Attorney General is not, as he suggests, attempting to enforce an existing State standard or pursue a simple common-law claim but, rather, is seeking to use this State's common law to penalize the manufacturers for producing engines which failed to comply with the Federal standards promulgated pursuant to the CAA. In doing so, the Attorney General is attempting to enforce those standards, and we now find that he is expressly preempted from pursuing those claims.

Moreover, the clear and undisputed intent of Congress, a pivotal point in any preemption analysis, was to avoid a "chaotic situation [from] developing" (HR Rep No. 728, *op. cit.*) where "vehicle manufacturers [would] be subject to 50 different sets of requirements relating to emission controls." (HR Rep No. 294, *op. cit.*) Were we to allow these claims to proceed, and were claims similar to these to proceed in our 49 sister States, the chaotic situation which Congress sought to avoid would become an overnight reality. In sum, States cannot be allowed to do indirectly what they cannot do directly (*International Paper Co. v Ouellette*, 479 US 481), and we find that common-law actions seeking damages from the manufacturers of HDDEs for the production of new engines which fail to comply with Federal standards are foreclosed.

To further illustrate the foregoing, the Attorney General's claim sounding in fraud has its genesis in the manufacturers'

purported concealment or misrepresentation of their violations of the Federal emissions standards, and liability would necessarily be based on the scope of those standards. The Attorney General also asserts a potential claim for public nuisance based upon the notion that "the manufacturers' alleged circumvention of federal emission control requirements has resulted in 1.3 millions of tons of excess NOx emissions annually," and that these emissions have resulted in poor air quality and acid precipitation. Since, as conceded by the Attorney General, a determination of whether the manufacturers complied with the Federal emissions standard (as interpreted by the Attorney General), and would do so in the future, is necessary to prove this claim, it is also preempted. So too is the State's potential breach of warranty claim since it is based upon a demonstration that the manufacturers have been "producing engines which do not comply with the emissions control warranty required under Federal law (42 USC § 7541 [a])."

The Attorney General's alleged conspiracy to restrain trade claim fares no better as it is grounded in the same conduct underlying the fraud, public nuisance and breach of warranty claims, i.e., the coordinated nature of the manufacturers' emission control practices; the manufacturers' submission of false certificates of compliance; their collective failure to develop engines which maximize full efficiency while still controlling emissions; and their "joint strategy of cheating on the emissions tests and concealing their use of defeat devices from EPA and the public." Even a cursory review of the above makes it clear that the predicate acts underlying the claim involve alleged violations of Federal emissions standards, which is exactly the sort of requirement proscribed by section 209 (a) of the CAA.

Lastly, we agree with the IAS Court that the issue of preemption is not premature and we are not persuaded by the Attorney General's reliance on *Matter of Oncor Communications v State of New York* (218 AD2d 60). In *Oncor*, the focus of the analysis was the preemption provision of the Communications Act of 1934 which, *inter alia*, preempted only the regulation of interexchange carriers' presubscription practices. The Third Department found that it could not equate the "service of a subpoena upon a communications carrier with 'regulation' of the communications industry" (*supra,* at 63). Here, the CAA preempts enforcement, as well as regulation, and the Attorney General has articulated the theories of liability under which he intends to proceed. Since a subpoena should be quashed when

the materials sought are, in fact, irrelevant to a legitimate subject of inquiry (*Matter of Reuters Ltd. v Dow Jones Telerate*, 231 AD2d 337; *Matter of A'Hearn v Committee on Unlawful Practice of Law of N. Y. County Lawyers' Assn.*, 23 NY2d 916, 918, *cert denied* 395 US 959), or when the subpoena is being used for a fishing expedition to ascertain the existence of evidence (*Matter of Reuters Ltd. v Dow Jones Telerate, supra,* at 342), in light of all of the foregoing, it is clear that the petitions at bar should be granted and the subpoenas quashed.

Accordingly, the order of the Supreme Court, New York County (Ira Gammerman, J.), entered January 19, 1999, which granted petitioners-respondents' petitions to quash the subpoenas duces tecum, should be affirmed, without costs.

WILLIAMS, TOM, LERNER and FRIEDMAN, JJ., concur.

Order, Supreme Court, New York County, entered January 19, 1999, affirmed, without costs.