**UNITED STATES of America,**
**Plaintiff,**

v.

**TOYOTA MOTOR CORPORATION,**
**et al., Defendants.**

**No. Civ.A. 99–1888 SSH.**

United States District Court,
District of Columbia.

Oct. 10, 2000.

Lydia Griggsby, Asst. U.S. Atty., Washington, DC, Mark A. Gallgher, David E. Alexander, James A. Lofton, Dept. of Justice, Environ. Enforcement Section, Washington, DC, for Plaintiff.

John Gibson Mullan, Stuart A.C. Drake, Kirkland & Ellis, Washington, DC, for defendants.

## OPINION

STANLEY S. HARRIS, District Judge.

Before the Court are defendants' motion to dismiss or stay litigation, plaintiff's opposition, and defendants' reply thereto. Upon consideration of the parties' submissions and the entire record, the Court denies defendants' motion.

## BACKGROUND

The government brings this action against Toyota Motor Corporation ("TMC"), Toyota Motor Sales, U.S.A., Inc. ("TMS"), and Toyota Technical Center, U.S.A., Inc. ("TTC") (collectively defendants or, where appropriate, "Toyota") for alleged violations of § 203(a)(1) of the Clean Air Act ("CAA"), 42 U.S.C. § 7522(a)(1). Section 203(a)(1) prohibits manufacturers of new motor vehicles from selling, offering for sale, introducing or delivering for introduction into commerce, or importing into the United States ("U.S.") new motor vehicles or new motor vehicle engines that are not covered by a certificate of conformity issued under regulations promulgated by the Environmental Protection Agency ("EPA").[1] "A certificate of conformity is, in effect, a license that allows an automobile manufacturer to sell vehicles to the public." *United States v. Chrysler Corp.*, 591 F.2d 958, 960 (D.C.Cir.1979). In order to obtain a certificate of conformity, a manufacturer must submit a separate application ("certificate application") to EPA for each class of new motor vehicles or new motor vehicle engines. *See* 40 C.F.R. § 86.094–21(a). The application must include an identification and description of the vehicle and its emission control system. *Id.* § 86.094–21(b)(1)(i). The government alleges that defendants violated § 203(a)(1) by selling, offering for sale, introducing or delivering for introduction into commerce, or importing into the U.S., approximately 2.2 million vehicles that were materially different from the corresponding vehicles described in Toyota's certificate applications and in the certificates of conformity subsequently issued by EPA. The alleged material differences pertain to the vehicles' onboard diagnostic ("OBD") systems; an OBD system monitors, controls, and records the

---

1. TMC is a foreign corporation, and is responsible for the design and manufacture of onboard diagnostic systems installed in the vehicles at issue in this case. *See* Answer ¶¶ 5–6. TMS is a California corporation which sold, offered for sale, or introduced or delivered for introduction into commerce, the vehicles in this case. *See id.* ¶ 7. TTC is a California corporation which prepared and submitted to EPA the applications for certificates of conformity covering those vehicles. *See id.* ¶ 8.

emissions released by a motor vehicle's engine. *See generally Motor & Equip. Mfrs. Ass'n v. Nichols,* 142 F.3d 449, 453 (D.C.Cir.1998).

## A. *Federal and California OBD Regulations*

The 1990 amendments to the CAA directed EPA to promulgate regulations requiring manufacturers to install OBD systems on new motor vehicles. *See* 42 U.S.C. § 7521(m). Accordingly, federal regulations now require that all light-duty vehicles and trucks for 1994 and later model-years be equipped with an OBD system capable of identifying emission system malfunctions that could cause emission increases above certain thresholds. *See* 40 C.F.R. § 86.094–17(a). Among other things, the regulations also require manufacturers to equip those vehicles with a malfunction indicator light (MIL) to inform vehicle operators of a malfunction in the emission system. *See id.* §§ 86–094.17(c) and (d).

In lieu of complying with the regulations promulgated by EPA, a manufacturer can satisfy federal OBD requirements for new vehicles through model-year 1998 by demonstrating compliance with California's OBD regulations, commonly referred to as "OBD II" requirements. *See id.* § 86.094–17(j). EPA promulgated the so-called "deemed to comply" rule because California already had a regulatory framework in place requiring manufacturers to install OBD systems in new vehicles. *See* S.Rep. No. 101–228, at 97 (1989) (discussing California regulatory framework). The rule, therefore, sought to ease the initial burden on manufacturers from complying with the new federal OBD regulations by allowing them to develop and install one "system nationwide during allowable model-years." *See* 56 Fed.Reg. 48,272, 48,273 (Sept. 24, 1991).

As relevant here, California's OBD II regulations require that all 1994 and subsequent model-year passenger cars, light-duty trucks, and medium-duty vehicles be equipped with an MIL "that will automatically inform the vehicle operator in the event of a malfunction of any powertrain components which can affect emissions." Cal.Code Reg. tit. 13, § 1968.1(a)(1.0). These vehicles must also be equipped with "an on-board diagnostic system capable of identifying the likely area of malfunction by means of fault codes stored in computer memory." *Id.* § 1968.1(a)(1.2). Among the malfunctions that must be monitored by the diagnostic system are leaks in the system for capturing evaporative emissions. *See id.* § 1968.1(b)(4.0). Evaporative emissions are "non-tailpipe" emissions that occur when fuel in a fuel tank evaporates and escapes into the atmosphere. *See* Decision of Administrative Law Judge ("ALJ Decision") (Pl.'s Opp'n, Ex. 1) at 6. Manufacturers are required to define, in their certification applications, the appropriate conditions enabling the OBD systems to monitor the evaporative emission system (the "monitoring conditions"), "subject to the limitation that the monitoring conditions shall be encountered at least once during the first engine start portion of the applicable FTP [federal test procedure] test." *Id.* § 1968.1(b)(4.3). OBD II regulations provide that "[u]pon detection of an evaporative system malfunction or a malfunction that prevents completion of an evaporative system check, the MIL shall illuminate and a fault code shall be stored no later than the end of the next driving cycle during which monitoring occurs provided the malfunction is again present." *Id.* § 1968.1(b)(4.4.1). OBD II regulations also require that the on-board computer store a code in the computer memory "upon first completing a full diagnostic check (i.e., the minimum number of checks necessary for MIL illumination) of all monitored components and systems ... since the computer memory was last cleared"; the code is known as the "Readiness/Function Code." *Id.* § 1968.1(e).

## B. *Approval of Toyota's OBD Systems*

TMC sought to take advantage of EPA's "deemed to comply" rule for Toyota vehi-

cles encompassing model-years 1996 through 1998. In July 1995, the California Air Resources Board ("CARB")—the state administrative agency that enforces OBD II regulations—approved the OBD II system descriptions for Toyota model-year 1996 vehicles. *See* Defs.' Mot., Ex. 5.[2] After CARB issued its approval, TTC submitted applications for certificates of conformity to EPA. The applications contained a copy of the CARB approval letter, as well as information about the monitoring of leaks in the evaporative system, including the monitoring conditions. *See, e.g.,* Pl.'s Opp'n, Ex. 3, Attach. A (Filed Under Seal). EPA issued a separate certificate of conformity for each engine family.[3] The certificates expressly covered "only those new motor vehicles or new motor vehicle engines which conform, in all material respects, to the design specifications that applied to those vehicles or engines described in the documentation required by 40 CFR Part 86." Pl.'s Opp'n, Ex. 3, Attach. D. This compliance process was repeated, without material change, for the 1997 and 1998 model-year vehicles at issue in this case. *See* Defs.' Mot. at 9.

## C. *CARB Proceedings*

OBD II regulations authorize CARB to perform "confirmatory testing" of a manufacturer's diagnostic systems in order to determine compliance with malfunction criteria identified in the manufacturer's approved certification documentation. *See* Cal.Code Reg. tit. 13, § 1968.1(j). CARB undertook this testing of the relevant Toyota vehicles in July 1997. The results of the tests led CARB to question the performance of the vehicles' OBD systems. In June 1998, the CARB Executive Officer sent TTC a letter informing it that CARB had determined that certain engine families for model-years 1996–1998 did not con-

form to OBD II requirements. *See* Defs.' Mot., Ex. 6. In September 1998, the CARB Executive Officer issued a formal notice of non-conformity, and ordered Toyota to recall approximately 337,700 vehicles which had been manufactured and certified for sale in California. *See* Defs.' Mot., Ex. 9. Thereafter, Toyota filed a petition for a hearing on the recall order, which CARB referred to an administrative law judge ("ALJ") from the California Office of Administrative Hearings. After the parties had conducted discovery, an evidentiary hearing commenced on July 13, 1999. As described by defendants, "[o]ver the course of 30 trial days, the CARB Executive Officer and Toyota presented more than 40 witnesses, more than 300 exhibits, and more than 5,000 pages of testimony." Defs.' Mot. at 12. On February 22, 2000, the ALJ issued a Proposed Decision, recommending that the CARB recall order be dismissed. The ALJ's Proposed Decision is now before the full CARB, which will issue its own written decision, setting forth findings of fact and conclusions. *See* Cal. Code Reg. tit. 17, § 60052.

## D. *The Government's Lawsuit*

The government originally filed this case on July 12, 1999, and filed an amended complaint on November 19, 1999. As discussed, the government alleges that Toyota sold, offered for sale, introduced or delivered for introduction into commerce, or imported into the U.S., motor vehicles that were not covered by certificates of conformity (the "affected vehicles"), insofar as they were materially different from the vehicles described by Toyota in its certificate applications and approved by EPA in the certificates of conformity. The affected vehicles encompass different models for model-years 1996 to 1998. *See* Am.Compl., App.A.

---

**2.** Citations to "Defs.' Mot." are to Defendants' Statement of Points and Authorities in Support of Motion To Dismiss or Stay Litigation Based on Primary Jurisdiction and Abstention.

**3.** An engine family is a group of engines with "similar emission characteristics throughout their useful life" which are treated similarly for certification purposes. 40 C.F.R. § 86.420–78(a).

The amended complaint alleges the following differences between the affected vehicles and those described in Toyota's certificate applications: (1) each affected vehicle is equipped with an OBD system that includes unreported monitoring conditions which reduce the system's monitoring frequency, as compared to that frequency which would occur under the conditions described in the certificate applications; (2) each affected vehicle is equipped with an unreported software-based device which reduces the ability of each vehicle to detect a malfunction in the evaporative emission system and to illuminate the MIL, as compared to the vehicle's ability to do the same under the system described in the certificate applications; (3) each affected Lexus model is equipped with an unreported software-based device which prevents monitoring of the evaporative emission system during the first engine start portion of the FTP; and (4) each affected Paseo and Tercel model is equipped with unreported software which prevents storage of the "Readiness/Function Code" of the vehicle's OBD system. *Id.* ¶ 43. The government contends that each sale of a vehicle not covered by a certificate of conformity constitutes a separate violation of § 203(a)(1) of the CAA. *See id.* ¶ 44. The government seeks injunctive relief, and civil penalties of up to $27,500 per affected vehicle sold. *See id.* ¶ 45.

 Defendants now move to dismiss or stay the case on three separate grounds. First, defendants invoke the doctrine of primary jurisdiction, under which a court stays or dismisses a case so that an agency may resolve certain issues in the case falling within its area of expertise. Second, defendants invoke the doctrine of *Burford* abstention, which requires a federal court to abstain from exercising jurisdiction in certain cases involving complex state administrative proceedings. *Burford v. Sun Oil Co.,* 319 U.S. 315, 325–334, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Third, defendants invoke the doctrine of *Colorado River* abstention, which requires a federal court to abstain from exercising jurisdiction in certain cases involving duplicative state court litigation. *Colorado River Water Conservation Dist. v. United States,* 424 U.S. 800, 817–19, 96 S.Ct. 1236, 47 L.Ed.2d 483 (1976).[4]

## DISCUSSION

### A. *Primary Jurisdiction*

 The doctrine of primary jurisdiction applies when a court has jurisdiction over a claim, but adjudication of the claim "requires the resolution of issues which, under a regulatory scheme, have been placed within the special competence of an administrative body; in such a case the judicial process is suspended pending referral of such issues to the administrative body for its views." *United States v. Western Pac. R.R.,* 352 U.S. 59, 63–64, 77 S.Ct. 161, 1 L.Ed.2d 126 (1956). The reasons supporting the doctrine's existence are a concern for uniform outcomes, which would be imperiled if courts were allowed

---

4. In a footnote, defendants also invoke the doctrine of *Pullman* abstention as an independent ground for granting their motion. *See* Defs.' Mot. at 28 n. 14. Enunciated in *Railroad Comm'n of Texas v. Pullman Co.,* 312 U.S. 496, 500–01, 61 S.Ct. 643, 85 L.Ed. 971 (1941), this doctrine requires a federal court to abstain from exercising jurisdiction over a case involving an uncertain issue of state law so that a state court may clarify the issue, where such clarification might moot a federal constitutional question arising in the case. Defendants argue that, in the CARB proceeding, they have raised "issues of vagueness and fair notice about the potential application and retroactive interpretation of the OBD II rules," and that these issues "may" apply to the government's claims in this case, but may be avoided by a definitive construction of OBD II rules emanating from the CARB proceeding. *See* Defs.' Mot. at 28 n. 14. Defendants' argument is meritless. Whether Toyota vehicles complied with OBD II requirements is not relevant to establishing its alleged liability for § 203(a)(1) violations. *See infra* Discussion Part A. Because defendants' vagueness and fair notice challenges are not a defense to the government's allegations in this case, they do not warrant *Pullman* abstention.

**40**

to resolve regulatory issues inconsistently, and the advantages that accrue from an agency's applying its specialized knowledge and expertise to a given matter. *See Texas & Pac. Ry. v. Abilene Cotton Oil Co.*, 204 U.S. 426, 441, 27 S.Ct. 350, 51 L.Ed. 553 (1907); *Western Pac. R.R.*, 352 U.S. at 64, 77 S.Ct. 161; *Nader v. Allegheny Airlines, Inc.*, 426 U.S. 290, 303–04, 96 S.Ct. 1978, 48 L.Ed.2d 643 (1976); *Allnet Communication Serv., Inc. v. National Exch. Carrier Ass'n*, 965 F.2d 1118, 1120 (D.C.Cir.1992). There is no "fixed formula" for applying the doctrine of primary jurisdiction; each case turns on whether the reasons for the doctrine's existence are present. *Western Pac. R.R.*, 352 U.S. at 64, 77 S.Ct. 161.[5]

Defendants argue that application of these factors militate in favor of applying the primary jurisdiction doctrine in this case. First, they contend that the basic issue raised by the government's lawsuit is the same as that involved in the CARB proceeding—whether the OBD systems on Toyota vehicles comply with California's OBD II requirements. Because this issue requires the interpretation and application of complex state regulations that have not been "definitively construed in this context," defendants argue that the Court should defer to CARB for an initial decision on the matter. Defs.' Mot. at 23. Furthermore, they argue that application of the primary jurisdiction doctrine is particularly appropriate where, as here, the issues that a court must resolve are already before an agency, the issues involve technical and scientific questions, and there is a danger of inconsistent state and federal orders. *Id.* at 23–27.

The government counters that the primary jurisdiction doctrine is inapposite be-

cause CARB does not have any jurisdiction over this case; it does not have jurisdiction to decide whether defendants violated § 203(a)(1) of the CAA, and does not have jurisdiction over the majority of vehicles involved in this case. Relatedly, the government disputes defendants' contention that the basic issue in this case and in the CARB proceeding are identical, arguing that compliance with OBD II regulations is irrelevant to establishing a violation of § 203(a)(1). The government also contends that deferring to the CARB proceeding would be inappropriate because the issues before the Court are not beyond the conventional expertise of judges, and because the remedy that the government seeks—substantial civil penalties and nationwide injunctive relief covering 2.2 million vehicles—is unavailable in the CARB proceeding. *See* Pl.'s Opp'n at 19–26.

At the outset, the Court clarifies the degree of similarity between the issues involved in the CARB proceeding and this case. As discussed, the matter currently before the full CARB concerns the recall of 337,700 Toyota vehicles in California for alleged violations of OBD II requirements. In this case, the government alleges that Toyota violated § 203(a)(1) of the CAA by selling, offering for sale, introducing or delivering for introduction into commerce, or importing into the U.S., 2.2 million vehicles that were not covered by certificates of conformity. Although California's OBD II requirements operate as the controlling federal standards with respect to these vehicles because Toyota proceeded under the "deemed to comply" rule, Toyota's compliance with OBD II requirements is not relevant to its liability under § 203(a)(1). *See Chrysler Corp.*, 591 F.2d at 960–61. In *Chrysler*, the government

**5.** Despite the absence of a fixed formula, this Court has observed that the following factors are generally considered in determining whether to invoke the primary jurisdiction doctrine: "(1) whether the question at issue is within the conventional experience of judges; (2) whether the question at issue lies peculiarly within the agency's discretion or requires

the exercise of agency expertise; (3) whether there exists a danger of inconsistent rulings; and (4) whether a prior application to the agency has been made." *AT & T v. MCI Communications Corp.*, 837 F.Supp. 13, 16 (D.D.C.1993) (quoting *Oasis Petroleum Corp. v. Department of Energy*, 718 F.2d 1558, 1564 (Temp.Emer.Ct.App.1983)).

sued Chrysler Corporation for violating § 203(a)(1) of the CAA. The government alleged that a number of vehicles manufactured by Chrysler were materially different from the vehicles described in its certificate applications because they were equipped with parts that did not conform to its design specifications. As here, each certificate issued by EPA covered "only those new motor vehicles or new motor vehicle engines which conform, in all material respects, to the design specifications described in the [certificate] application." *Id.* at 959. The government argued that a vehicle was "materially" different if the "difference in parts reasonably may be expected to affect emission controls." *Id.* at 960. The district court adopted the government's position, found thirty-seven violations of § 203(a)(1), and levied a fine against Chrysler. On appeal, Chrysler argued that its misbuilt vehicles did not violate § 203(a)(1) if it could prove that they complied with federal emission standards. The Court of Appeals rejected this contention:

> Adoption of Chrysler's approach ... would allow a manufacturer to sell vehicles without certificates of conformity if he could later prove that they meet the applicable emission standards. This result would frustrate clear congressional intent, as expressed in sections 203 and 206 [of the CAA], that vehicles pass emission tests before they may be sold to the public. We do not believe that the Congress that provided for mandatory premarketing certification, and for civil penalties for the sale of each vehicle not covered by a certificate of conformity, would have favored use of a test that conceivably could subject every automobile to emission tests after manufacture and sale.

*Id.* at 959–61. Under *Chrysler*, therefore, whether the 2.2 million Toyota vehicles in this case comply with California's OBD II regulations—the central question currently before CARB—is not relevant to establishing Toyota's liability under § 203(a)(1).

Nevertheless, Toyota's compliance with OBD II regulations is still relevant to this case. First, as the government admits, defendants may assert the issue of compliance with OBD II regulations "to challenge the relief sought or to mitigate the statutory penalties provided for under Section 205(b), 42 U.S.C. § 7524(b), after liability has been established." Pl.'s Opp'n at 22 n. 7. Second, as alleged in the amended complaint, the accuracy of Toyota OBD systems, and the frequency with which they operate, bear on whether the differences between the manufactured vehicles and those described in Toyota's certificate applications are material. Am.Compl. ¶ 43. Those issues are currently before CARB, as they form part of its inquiry into whether Toyota vehicles should be recalled for non-compliance with OBD II standards. *See* ALJ Decision at 22–28. In sum, there is a significant overlap between the issues involved in this case and in the CARB proceeding.

■ Given this overlap, as well as the complex and technical nature of this case, the Court would have little difficulty concluding that the primary jurisdiction doctrine should be invoked if this case presented the more typical situation in which a party requests a primary jurisdiction referral to a federal agency. *See Johnson v. Nyack Hosp.*, 964 F.2d 116, 122 (2d Cir.1992) (noting that "most primary jurisdiction cases involve questions of whether the district court should defer to a *federal* agency's determination of factual questions"). Defendants, however, seek a referral to a state agency.[6] Although courts have invoked the doctrine in favor of state agencies in the past, *see infra*, the Court declines to do so here because the federal OBD regime does not place resolution of the issues overlapping the CARB proceeding and this case "within the special competence" of CARB. *Western Pac. R.R.*, 352 U.S. at 64, 77 S.Ct. 161. The CAA vests

---

6. Neither party has requested a primary jurisdiction referral to EPA.

the federal government with exclusive authority to regulate motor vehicle emissions and, with a limited exception, provides that state regulations are preempted.[7] *See* 42 U.S.C. § 7543(a); *American Auto. Mfrs. Ass'n v. Massachusetts Dep't of Envtl. Protection,* 163 F.3d 74, 77 (1st Cir.1998); *Motor & Equip. Mfrs. Ass'n,* 142 F.3d at 452–53. In enacting the 1990 CAA amendments, Congress directed EPA to promulgate federal regulations on emission control diagnostic systems. *See* 42 U.S.C. § 7521(m). To be sure, when EPA promulgated OBD regulations, it provided manufacturers with the option of complying with California's OBD II requirements as a means of satisfying federal requirements for new vehicles through model-year 1998. *See* 40 C.F.R. § 86–094.17(j). Nevertheless, the effect of the "deemed to comply" rule was only to adopt OBD II requirements as a surrogate for federal standards; by promulgating the rule, EPA did not abdicate its authority to apply and enforce OBD II standards in the federal context. To the contrary, EPA has expressly reserved this authority:

> The Agency has consistently stated that allowing manufacturers to satisfy federal OBD requirements by demonstrating compliance with California OBD II requirements is simply a compliance option, not an abdication of federal authority.... EPA independently reviews California OBD II regulations to determine their appropriateness. Any decision to include such regulations is premised on such regulations being consistent with and appropriate under the Clean Air Act. EPA has found that California's OBD II regulations appropriately implement the requirements of section 202(m) and that allowing compliance with such regulations as a compliance option is an appropriate policy, promoting national consistency with no loss of environmental protection.... EPA operates its own OBD certification and compliance program and makes all determinations regarding whether vehicles may be certified as complying with federal OBD regulations.

63 Fed.Reg. 70, 681, 70,687 (Dec. 22, 1998); *see also* 58 Fed.Reg. 9468, 9469 (Feb. 19, 1993) (noting that "EPA will conduct its own enforcement programs separately from California ..."). Because EPA did not relinquish any enforcement authority through the "deemed to comply" rule, CARB is not vested with the "special competence" to resolve issues involving OBD II requirements when they arise under the federal OBD regime, such as to justify a primary jurisdiction referral.

The cases cited by defendants in which federal courts invoked the doctrine of primary jurisdiction in favor of state agencies, *see* Defs.' Mot. at 24–25, do not compel a contrary conclusion. In those cases, the relevant state agency was either expressly authorized by Congress to receive a primary jurisdiction referral, *see Delaware State College v. Ricks,* 449 U.S. 250, 254, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980), or was the only agency capable of addressing the issues referred to it due to the absence of a parallel federal agency, *see Northwinds Abatement, Inc. v. Employers Ins. of Wausau,* 69 F.3d 1304, 1309–11 (5th Cir.1995); *Johnson,* 964 F.2d at 120–23. None of those cases involved a situation analogous to that present here, in which a federal agency has incorporated state regulations into a federal regulatory regime,

---

7. The CAA allows California to promulgate its own emission standards for new motor vehicles, provided California determines that its standards will be "at least as protective of public health and welfare as applicable Federal standards." *See* 42 U.S.C. § 7543(b). California's discretion, however, is not boundless; it must receive a preemption waiver from EPA, and EPA may refuse to grant such a waiver it finds that California's determination was arbitrary and capricious, its needs are not so extraordinary and compelling as to warrant separate state regulations, or its standards are inconsistent with § 202(a) of the CAA, 42 U.S.C. § 7521(a). *See* 42 U.S.C. § 7543(b); *American Auto. Mfrs. Ass'n,* 163 F.3d at 77 & n. 3; *Motor & Equip. Mfrs. Ass'n,* 142 F.3d at 452–53.

and retained enforcement authority over those regulations in the federal context.[8]

Defendants, however, maintain that the "deemed to comply" rule requires EPA to defer to CARB decision-making on questions involving OBD II requirements lest EPA issue conflicting decisions that ultimately produce the "very clash of regulatory regimes that the rule was promulgated to avoid." *See* Defs.' Reply at 13. Defendants' argument lacks merit. First, the purpose of the "deemed to comply" rule was to ease the burden on manufacturers from having to comply with separate OBD regimes by aligning federal standards with California standards, and thereby allowing manufacturers "to implement one OBD system nationwide that fully meets the intent of the Clean Air Act and its amendments." 63 Fed.Reg. at 70,687. That purpose is hardly jeopardized by EPA's performing an independent evaluation of vehicles' compliance with OBD II regulations. Second, EPA takes into account CARB certification results in determining whether a vehicle's system complies with OBD II requirements, *see* 58 Fed.Reg. at 9473, thereby reducing the risk of inconsistent federal-state regulation. Similarly, because EPA assisted CARB in developing OBD II standards, *see* S.Rep. No. 101–228, at 97 (1989), and independently reviews OBD II regulations to ensure that they are consistent with the CAA, *see* 63 Fed.Reg. at 70,687, it is undoubtedly familiar with CARB's position as to the purpose and design of the OBD II standards, and like-

ly considers this background information when it construes and applies OBD II requirements. Defendants' concern over a clash of regulatory regimes is, therefore, overstated.

Finally, adopting defendants' argument about deferring to CARB on OBD II—related issues would have serious implications for enforcement actions under the CAA. A requirement that EPA—and the federal courts under the primary jurisdiction doctrine—suspend every action raising OBD II issues until CARB rendered a decision would unduly hamper federal OBD enforcement actions.[9] *See American Auto. Mfrs. Ass'n,* 163 F.3d at 81 (potential delay from primary jurisdiction referral appropriate consideration in determining whether to invoke doctrine). Moreover, only a fraction of the vehicles typically involved in such actions will come within CARB's jurisdiction; in this case, for example, only 337,700—15%—of the 2.2 million vehicles at issue were sold or offered for sale within California. Requiring EPA and the federal courts to defer to CARB decision-making on OBD II—related issues would allow CARB's enforcement determinations to dictate, or at least influence, the results of nationwide enforcement actions involving much greater numbers of vehicles. The Court does not find that Congress envisioned—much less approved—such an abdication of federal authority in directing EPA to promulgate OBD regulations that approximate California regulations.[10] Nor would

---

8. Defendants also cite decisions of the Court of Appeals for this Circuit. *See Dial A Car, Inc. v. Transportation, Inc.,* 82 F.3d 484, 490 (D.C.Cir.1996) (Edwards, C.J., concurring); *Montgomery Envtl. Coalition Citizens Coordinating Comm. on Friendship Heights v. Washington Suburban Sanitary Comm'n,* 607 F.2d 378 (D.C.Cir.1979); and *Potomac Passengers Ass'n v. Chesapeake & Ohio Ry.,* 520 F.2d 91 (D.C.Cir.1975). Those cases are inapposite.

9. Admittedly, this case is unlike the usual primary jurisdiction case in which a court enables a referral of issues to an agency, as the relevant issues are already before an agency; the ALJ has issued a Proposed Deci-

sion on the California recall order, and the matter is under consideration by the full CARB. Nevertheless, after CARB issues its decision, Toyota or the CARB Executive Officer may request reconsideration of the decision. *See* Cal.Code Reg. tit. 17, § 60053(a). Thus, the delay in this case from a primary jurisdiction referral would not necessarily be insignificant.

10. A Senate report prepared in connection with the 1990 CAA amendments specifically mentions California's OBD II regulations in discussing the requirement that EPA promulgate federal OBD regulations: "EPA participated closely with California in the

such an abdication be consistent with the CAA, which vests in the federal government almost "complete and exclusive authority to regulate motor vehicle emissions." *American Auto. Mfrs. Ass'n,* 163 F.3d at 77; *see also supra* note 7.

At its core, this case involves alleged violations of a federal statute, implicating federal regulations which, in this context, adopt state regulatory standards as a surrogate for federal standards. These circumstances do not justify invoking the doctrine of primary jurisdiction in favor of a state agency.

## B. *Burford Abstention*

■■ Defendants also invoke the doctrine of *Burford* abstention as a ground for dismissal. Under this doctrine, a federal court abstains from exercising jurisdiction in order to avoid intrusion into complex state administrative processes. *See Colorado River,* 424 U.S. at 815–16, 96 S.Ct. 1236; *District Properties Assocs. v. District of Columbia,* 743 F.2d 21, 28 n. 5 (D.C.Cir.1984). A federal court may dismiss a case under *Burford* only if it involves "difficult questions of state law bearing on policy problems of substantial public import whose importance transcends the result in the case," or if federal adjudication "would be disruptive of state efforts to establish a coherent policy with respect to a matter of substantial public concern." *New Orleans Public Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 361, 109 S.Ct. 2506, 105 L.Ed.2d 298 (1989) (internal quotations and citation omitted). Nevertheless, there is no "formulaic test for determining when dismissal under *Burford* is appropriate." *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 727, 116 S.Ct. 1712, 135 L.Ed.2d 1 (1996). In each case, the court must balance "the strong federal interest in having certain classes of

cases, and certain federal rights, adjudicated in federal court, against the State's interests in maintaining uniformity in the treatment of an essentially local problem." *Id.* at 728, 116 S.Ct. 1712 (internal quotations and citations omitted). This balance only "rarely" weighs in favor of abstention. *Id.*

■ The Court declines to invoke the doctrine of *Burford* abstention because this case does not present a dispute over an essentially local problem in which California's interests are paramount. The government is suing Toyota for nationwide violations of federal law with respect to 2.2 million motor vehicles; California has jurisdiction over only 15% of these vehicles. Further, the government is suing under a provision of the CAA which does not require it to show that Toyota violated California's OBD II regulations in order to establish Toyota's alleged liability. *See supra* Part A. And, to the extent OBD II regulations are relevant to this case, it is because EPA adopted them as a surrogate for federal standards through the "deemed to comply" rule. As noted, by adopting this rule, EPA did not relinquish any enforcement authority. *See id.* The federal regulatory context in which California's OBD requirements arise, and California's jurisdiction over but a small fraction of the vehicles at issue, satisfy the Court that this case does not present the rare situation warranting *Burford* abstention.

## C. *Colorado River Abstention*

■ Finally, defendants seek to dismiss this case under the doctrine of *Colorado River* abstention, which applies when a federal and state court exercise jurisdiction over a matter concurrently. As a general rule, the pendency of an action in state court does not preclude parallel fed-

---

development of the California regulations. The Federal regulations should adopt to the extent appropriate the same technical requirements, minimizing development costs and facilitating use of the same hardware and other system attributes nationwide."

S.Rep. No. 101–228, at 97 (1989). The report does not suggest, however, that EPA must defer to CARB with respect to the interpretation and enforcement of any possibly parallel federal regulations.

eral court proceedings. *See Colorado River*, 424 U.S. at 817, 96 S.Ct. 1236. Nevertheless, principles of "wise judicial administration" sometimes permit—albeit in exceptional cases—a federal court to dismiss such proceedings. *Id.* at 817–18, 96 S.Ct. 1236. Among those factors which a federal court may consider in determining the appropriateness of abstention under this doctrine are whether the federal or state court has jurisdiction over the res, the order in which the courts assumed jurisdiction, the inconvenience of the federal forum, the desirability of avoiding piecemeal litigation, and the presence of federal-law issues. *See id.* at 818, 96 S.Ct. 1236; *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 25–26, 103 S.Ct. 927, 74 L.Ed.2d 765 (1983). "No one factor is necessarily determinative; a carefully considered judgment taking into account both the obligation to exercise jurisdiction and the combination of factors counseling against that exercise is required." *Colorado River*, 424 U.S. at 818–19, 96 S.Ct. 1236.

■ Assuming that the *Colorado River* doctrine is not limited to state court litigation, and extends to state administrative proceedings, the relevant factors in this case militate against abstention. Admittedly, this case began well after the CARB proceeding was underway and, in contrast to the CARB proceeding, is still at a nascent stage; discovery has been stayed pending resolution of defendants' motion to dismiss.[11] *See* May 19, 2000, Order of Magistrate Judge Robinson. Nevertheless, the presence of federal-law issues and the significant discrepancies between the two proceedings outweigh those factors counseling jurisdictional restraint. First, the government is suing Toyota for nationwide violations of federal law. *See Moses H. Cone*, 460 U.S. at 26, 103 S.Ct. 927 ("Although in some rare circumstances the presence of state-law issues may weigh in favor of that surrender [of federal jurisdic-

tion], the presence of federal-law issues must always be a major consideration weighing against surrender."). Second, despite sharing similar issues, the state and federal proceedings are by no means parallel: this case involves more vehicles, a different sovereign party, and different remedies than the CARB proceeding. Further, the primary issue being adjudicated in the CARB proceeding—Toyota's compliance with OBD II regulations—is not relevant to establishing Toyota's alleged liability for § 203(a)(1) violations. In short, the significant dissimilarities between the two actions do not establish a "substantial likelihood that the state litigation will dispose of all claims presented in the federal case." *Lumen Constr., Inc. v. Brant Constr. Co.*, 780 F.2d 691, 695 (7th Cir.1985) (citations omitted); *see also TransDulles Ctr., Inc. v. USX Corp.*, 976 F.2d 219, 224 (4th Cir.1992) (*Colorado River* abstention inappropriate because, although concurrent state court proceeding arose out of and involved "same underlying set of operative facts" as federal case, it did not duplicate it; state litigation involved "dissimilar parties and different legal theories"); *University of Maryland v. Peat Marwick Main & Co.*, 923 F.2d 265, 276 (3d Cir.1991) ("[W]hile certain issues to be litigated in the . . . federal claim may be identical to issues that have been or will be raised . . . in state court, the lack of identity of all issues necessarily precludes *Colorado River* abstention."). Those dissimilarities, as well as the presence of federal-law issues and the "virtually unflagging obligation of the federal courts to exercise the jurisdiction given them," *Colorado River*, 424 U.S. at 817, 96 S.Ct. 1236, render *Colorado River* abstention inappropriate in this case.

## CONCLUSION

For the foregoing reasons, defendants' motion to dismiss or stay litigation is de-

---

11. Defendants have not asserted the inconvenience of the federal forum as a factor favor-

ing abstention, nor does the Court find that this factor applies in this case.

**46**

nied. An appropriate Order accompanies this Opinion.

## ORDER

For the reasons stated in the accompanying Opinion, it hereby is

ORDERED, that defendants' motion to dismiss or stay litigation is denied.

SO ORDERED.